383 A.2d 802

COMMONWEALTH of Pennsylvania, Pennsylvania LABOR
RELATIONS BOARD, Appellant,

v.

FABRICATION SPECIALISTS, INC., Appellee.

Supreme Court of Pennsylvania.

Argued Jan. 10, 1977.

Decided Jan. 26, 1978.

24

James F. Wildeman, James L. Crawford, Anthony J. Molloy, Jr., Forest N. Myers, Asst. Attys. Gen., for appellant.

Jay N. Abramowitch, Miller & Murray, Reading, for appellee.

Before EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION

MANDERINO, Justice.

Appellee, Fabrication Specialists, Inc., is a nonunion shop employing about thirty-five workers. One of appellee's employees, Gary Vogel, filed a written charge of unfair labor practices with the Pennsylvania Labor Relations Board, alleging appellee violated Section 6(1)(a), (b), (c), and (e) of the Pennsylvania Labor Relations Act. Vogel's allegations were based on his discharge on the day after he had organized and conducted a meeting with fellow employees for the purpose of forming a grievance committee. The Board issued a complaint to which was attached a copy of Vogel's charge of unfair labor practices.

After conducting a hearing, the Board found no violation of Section 6(1)(b) or 6(1)(e), but found that appellee had committed unfair labor practices in violation of Section 6(1)(a) and 6(1)(c) of the Act, and ordered Vogel's reinstatement with back pay. This order was affirmed by the Court of Common Pleas of Berks County. The Commonwealth Court reversed the order of the Court of Common Pleas and we granted the Board's petition for allowance of appeal.

The Commonwealth Court accepted the Board's findings of fact, agreeing that there was substantial evidence to support the Board's conclusion that Vogel had been discharged because he had called a meeting of employees to discuss grievances with respect to working conditions. The Commonwealth Court held, however, that such conduct did not constitute a violation of either Section 6(1)(a) or 6(1)(c). According to the Commonwealth Court, the employer's conduct constituted an "unfair practice described" by Section 5 of the Act and not by any of the provisions of Section 6. According to the Commonwealth Court, however, appellee

could not be found guilty of violating Section 5 because it had never been charged with a violation of that Section. The Commonwealth Court therefore reversed the order of the Court of Common Pleas, although in doing so it indicated that had a violation of Section 5 been charged, it would have affirmed an order based on a violation of that section.

We reverse the decision of the Commonwealth Court, for in finding no violation of Section 6, the Court has misconstrued the plain meaning of the Act, and in finding a violation of Section 5 it has created an unfair labor practice where none exists.

The Commonwealth Court erroneously based its decision on *Lancaster Yellow C & B v. PLRB*, 371 Pa. 49, 88 A.2d 866 (1952). The *Lancaster* language relied on by the Commonwealth Court is as follows:

> "Subsection (1) of Section 6 of the Pennsylvania Labor Relations Act of 1937, as amended, 43 P.S. § 211.6, under which the controversy arises, in six clauses, (a), (b), (c), (d), (e), and (f), defines unfair labor practices by the employer.
>
> . . .
>
> Although the strict rules of pleading do not apply to proceedings before an administrative board, (*Kochinsky v. Independent Pier Company*, 157 Pa.Super.Ct. 15, 18, 41 A.2d 409,) the employer charged with an unfair labor practice is entitled to know *which one of the six unfair labor practices enumerated in the act* is the basis for the complaint just as the Union is entitled to be specifically apprised as to which one of the five unfair labor practices in the present act it or its constituents may be alleged to have violated together with the possible consequences of a finding of such specific violation." (Emphasis added.) 371 Pa. at 53 and 59, 88 A.2d at 867 and 868.

■■ The Commonwealth Court correctly read *Lancaster* as requiring the employer to be specifically notified as to what Subsection of the Act has allegedly been violated. *Lancaster*, however, provides no support for the Commonwealth Court's conclusion that Section 5 of the Act describes

an unfair labor practice. On the contrary, *Lancaster* points out that Section 6 contains *all* of the unfair labor practices with which one can be charged. *Lancaster* held that an employer is entitled to know "which one of the *six unfair labor practices enumerated* in the act" is charged. *Id.* 371 Pa. at 59, 88 A.2d at 868. As provided in Section 3(g) of the Act:

"The term 'unfair labor practice' means only these unfair labor practices listed in section six of this act."

Section 5 of the Act does not mention activities prohibited to the employer, but defines those rights granted by the Legislature to employees.

"*Employes shall have the right* to self-organization, to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection." 1937, June 1, P.L. 1168, 43 P.S. § 211.5. (Emphasis added.)

Section 6, on the other hand, specifies those activities which will henceforth be considered unlawful practices if pursued by the employer. Each subsection of Section 6 describes an unfair labor practice in which the employer may not engage. In filing its complaint, the Board complied fully with the requirements of *Lancaster* that an employer be notified as to the exact charges against it, for not only were the relevant subsections duly charged but the "specification of charges" served on the appellee set forth the particulars of the incident giving rise to the complaint.

The Board found that appellee had committed unfair labor practices under Section 6(1)(a) and 6(1)(c). Section 6(1)(a) provides:

"(1) It shall be an unfair labor practice for an employer—
 (a) To interfere with, restrain or coerce employes in the exercise of the rights guaranteed in this act."
43 P.S. § 211.6(1)(a).

The "rights guaranteed in this act" are the rights guaranteed by Section 5, the only section of the Act which makes

an affirmative grant of rights to employees. The Board found that these rights had been restrained, and the Commonwealth Court's holding that such a violation required a charge under Section 5 was erroneous. Since these rights were restrained and the proper charge under 6(1)(a) was made, we reinstate the order of the Labor Board finding an unfair labor practice in violation of Section 6(1)(a).

The Commonwealth Court also concluded that no violation of Section 6(1)(c) had been established. It is necessary that a violation of 6(1)(c) be established before the remedy of reinstatement with back pay can be ordered. See § 8(c).

Section 6(1)(c) provides that:

"It shall be an unfair labor practice for an employer—. . . (c) By discrimination in regard to hire or tenure of employment, or any term or condition of employment to encourage or discourage membership in any labor organization."

43 P.S. § 211.6(1)(c).

"Labor organization" is defined in Section 3(f) of the Act as follows:

"(f) The term 'labor organization' means any organization of any kind, or any agency or employe representation committee or plan in which employes participate, and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work."

The Commonwealth Court held that no violation of the above provisions of the Act occurred because it was not established that Vogel was discharged "to discourage his membership in a labor organization." According to the Commonwealth Court, and the appellee here, no "labor organization" existed at appellee's plant, none had been formed as the result of the meeting called by Vogel, and, appellant's discharge could not have discouraged membership in a labor organization that was nonexistent.

30

We reject the Commonwealth Court's overly restrictive interpretation of Section 6(1)(c). According to the Commonwealth Court's interpretation, Section 6(1)(c) permits an employer to fire an employee who attempts to form a labor organization as defined by the Act, as long as the discharge occurs before any such labor organization comes into formal existence at the employer's plant. Section 6(1)(c) does not call for such a result. Under Section 6(1)(c), if the employer's conduct discourages membership in any labor organization an unfair labor practice takes place. An employee might call a meeting to discuss forming a new labor organization or joining an existing labor organization which is not established at the employer's place of business. Firing an employee for calling an organization meeting certainly tends to discourage not only that employee but other employees from becoming members of *any* labor organization. A common sense reading of the Act requires that it cover a situation such as exists here, and prohibit the employer from discouraging membership in any labor organization, regardless of whether such labor organization exist at the employer's place of business, exists somewhere else, or is not yet in existence at all. Any other view would prevent the formation of new labor organizations, for it would enable the employer to discharge employees for participation in all the activities necessarily preliminary to the establishment of a formal labor organization.

The public policy of the Commonwealth and the stated purposes of the Act are set forth in Section 2.

"(a) Under prevailing economic conditions, individual employes do not possess full freedom of association or actual liberty of contract. Employers in many instances, organized in corporate or other forms of ownership associations with the aid of government authority, have superior economic power in bargaining with employes. This growing inequality of bargaining power substantially and adversely affects the general welfare of the State by creating variations and instability in competitive wage rates and working conditions within and between industries, and by

depressing the purchasing power of wage earners, thus— (1) creating sweat-shops with their attendant dangers to the health, peace, and morals of the people; (2) increasing the disparity between production and consumption; and (3) tending to produce and aggravate recurrent business depressions. The denial by some employers of the right of employes to organize and the refusal by employers to accept the procedure of collective bargaining tend to lead to strikes, lock-outs, and other forms of industrial strife and unrest, which are inimical to the public safety and welfare, and frequently endanger the public health.

(b) Experience has proved that protection by law of the right of employes to organize and bargain collectively removes certain recognized sources of industrial strife and unrest, encourages practices fundamental to the friendly adjustment of industrial disputes arising out of differences as to wages, hours or other working conditions, and tends to restore equality of bargaining power between employers and employes.

(c) In the interpretation and application of this act and otherwise, it is hereby declared to be the public policy of the State to encourage the practice and procedure of collective bargaining and to protect the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection, free from the interference, restraint or coercion of their employers.

(d) All the provisions of this act shall be liberally construed for the accomplishment of this purpose.

(e) This act shall be deemed an exercise of the police power of the Commonwealth of Pennsylvania for the protection of the public welfare, prosperity, health, and peace of the people of the Commonwealth."
43 P.S. § 211.2.

The Legislature has mandated that we consider these findings and purposes in our interpretation of the Act.

Section 1921 of the Statutory Construction Act, 1 Pa.C.S.A. § 1921 establishes legislative intent as the objective of all statutory construction.

"(a) The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly. Every statute shall be construed, if possible, to give effect to all its provisions."

The policy of the Pennsylvania Labor Relations Act to remove "sources of industrial strife and unrest" and to protect employees' "full freedom of association" and "self organization" can be effectuated only by the liberal construction mandated by the Act itself in Section 2(d), supra. The restrictive reading of the Commonwealth Court could serve only to foster unrest by denying employees the right to associate freely for their mutual aid and protection.

The Legislature, by granting the right to "self organization" has stated its intention to assure to employees, not only the right to participate in unions of which they are already members, but also the right to join other existing labor organizations or to form new labor groups. To do so, employees need the protection of Section 6. If one employee can be discharged for calling or attending a meeting with fellow employees, the rights of all employees are chilled. No labor organization could be formed, for no employee would feel free to meet with co-workers or to discuss complaints and grievances.

Section 6(1)(c) states that an employer may not discriminate in regard to tenure "to discourage membership in *any* labor organization." (Emphasis added.) Although there may have been no formal organization in existence at appellee's plant when Vogel was discharged, the natural and probable consequences of a discharge for labor activities are to discourage all his fellow employees from forming or joining a union now or at any time in the future.

If an employee may be discharged for engaging in activity protected by the Act, the "protected activity would lose some of its immunity, since the example of employees who are discharged on false charges would or might have a

deterrent effect on other employees." *NLRB v. Burnup & Sims*, 379 U.S. 21, 23, 85 S.Ct. 171, 172, 13 L.Ed.2d 1, 3 (1964). (*See also PLRB v. Loose*, 402 Pa. 620, 168 A.2d 323 (1961) authorizing use of federal decisions involving similar provisions of the National Labor Relations Act in construing the Pennsylvania Labor Relations Act.)

Appellee also argues that the evidence is not sufficient to support the Board's findings of fact as to Vogel's discharge being motivated by his attempt to form a grievance committee.

 The scope of review in a proceeding under this Act is limited to a determination of whether the findings of the Board are supported by substantial and legally credible evidence as required by Section 9(b) of the Act, and whether the conclusions drawn from the evidence are reasonable. Determining credibility of witnesses and weighing conflicting evidence are functions reserved to the Board. *P. L. R. B. v. Sand's Restaurant Corp.*, 429 Pa. 479, 240 A.2d 801 (1968); *P. L. R. B. v. Kaufmann Dept. Stores, Inc.*, 345 Pa. 398, 29 A.2d 90 (1942).

██ We have already determined that a meeting of employees to plan a course of action for dealing with their employer is an activity protected from employer interference by Section 6. The record contains substantial credible evidence that the employees met for the purposes of discussing working conditions and planning a system for dealing with their employer. There is also substantial credible evidence establishing that appellee discharged Vogel because of this activity. Complaints about Vogel's work habits were cited as the motivation for his discharge, but substantial evidence to support the Board's contrary finding exists. There is testimony that nothing was said about Vogel's work habits at the time of his discharge, and that the president of appellee corporation told Vogel that "you no longer like it here and we no longer like you." Also, the testimony indicates that the employer knew of and had discussed Vogel's meeting with another employee before firing him.

Finally, Vogel was discharged within twelve hours of the meeting on the previous night. The record therefore adequately supports the Board's finding that Vogel's labor activity prompted his discharge.

The decision of the Commonwealth Court is reversed and the order of the Board is reinstated.

JONES, former C. J., did not participate in the consideration or decision of this case.

POMEROY, J., concurred in the result.